IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CHRISTINE SINGH,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Civil No. 13-cv-857-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Christine Singh seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in June, 2010, alleging disability beginning on January 1, 2009. The alleged date of onset was later amended to January 5, 2010 (Tr. 20). After holding an evidentiary hearing, ALJ Joseph L. Warzycki denied the application in a written decision dated March 2, 2012. (Tr. 20-28). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 16.

1

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ ignored evidence favorable to the claimant, i.e., a letter from her employer.

2. The ALJ misstated plaintiff's testimony regarding her daily activities.

3. The ALJ erred in not giving appropriate weight to the opinions of her treating neurologist, Dr. Singer, with regard to numbness in her left arm and hand.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §423(d)(3).**  "Substantial gainful activity" is work activity that involves doing

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

2

significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.**

If the answer at steps one and two is "yes," the claimant will automatically be

3

found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Ms. Singh was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** ***Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).**  In reviewing for "substantial evidence," the entire administrative record is taken into consideration,

4

but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Warzycki followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He found that plaintiff had severe impairments of status post cerebrovascular infarction, hypertension, migraine headaches, seizures, and anxiety and depression controlled by medication. He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Singh had the residual functional capacity (RFC) to perform work at the light exertional level, with a number of physical and mental limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work. She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record

is directed to the points raised by plaintiff and is confined to the relevant time period. Plaintiff has not raised an issue with respect to her mental impairments. Therefore, the Court will not summarize that evidence in any detail.

1. **Agency Forms**

Plaintiff was born in 1971, and was 39 years old on the alleged onset date of January 5, 2010. She was insured for DIB through March 31, 2012. (Tr. 161-162). She had completed two years of college and had worked doing medical billing and coding from 1990 through August, 2006. (Tr. 166). She worked as a bartender/server in a restaurant from 2006 to 2007. The owner of the restaurant permitted her to work only when she was physically able. (Tr. 188-189).

Plaintiff submitted a Function Report in July, 2010, in which she stated that she had a number of problems, including limited fine and gross manipulation. She reported that she did "light housework as dizziness/condition allows, take naps after taking medications, fatigue very easily." She had problems such as difficulty with buttons and zippers and with cutting meat due to neuropathy. She did not do dishes because she broke them. (Tr. 179-181). She stated that dizziness and neuropathy affected all exertional activity. (Tr. 184).

2. **Evidentiary Hearing**

Ms. Singh was represented by an attorney at the evidentiary hearing on February 16, 2012. (Tr. 35).

Her alleged date of disability was amended to January 5, 2010, because that was the day after the denial of a prior application. (Tr. 48)

The ALJ acknowledged that he had read a statement from plaintiff's

employer. Counsel noted that the letter was not in the record, and the ALJ suggested that he "might want to scan that into the file to make sure that gets in there." (Tr. 36).

Ms. Singh was 40 years old. She was 5'2" and weighed 192 pounds. (Tr. 39). She was working part time at a restaurant doing filing. She only worked when she felt well enough. (Tr. 41). She last worked full-time in 2005, before she had a stroke. (Tr. 43).

The ALJ asked plaintiff to describe her daily activities. She lived with her mother. She said she tried to do dishes, but she usually broke a plate or a glass. She did some laundry, and was able to change her sheets. She did not vacuum, mop or sweep. She could use her hands, but she got "nerve ending pain in them" and could not feel things as well. She missed buttons and zippers sometimes. She could open a doorknob only sometimes. (Tr. 49-50).

The ALJ asked Ms. Singh about what residuals she had from the stroke. She testified that her left side was worse than her right, but she did not have "dexterity at all in either hand." (Tr. 62).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, limited to only occasional climbing, balancing, stooping, crouching, kneeling and crawling, with no climbing of ladders, ropes or scaffolds. She should have no concentrated exposure to moving machinery, unprotected heights or noise. She was limited to simple, repetitive tasks and instructions. The VE testified that this

person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do. Examples of such jobs are usher-ticket taker, hand presser and small parts bench hand assembly. If, in addition to the other limitations already listed, she were also limited to "only occasional fine manipulation with the upper extremities," there would be no jobs that she could do. (Tr. 74-75).

3.  **Medical Treatment**

Most of the medical records predate the alleged onset date of January 5, 2010.

Dr. Barry Singer, a neurologist, began treating Ms. Singh after she suffered a stroke in August, 2006. In January, 2007, Dr. Singer reported that the stroke "resulted in cognitive impairment, left leg weakness, left arm and leg sensory loss, and coordination difficulties." (Tr. 452).

In October, 2009, about two and one-half months before the alleged date of onset, she complained to Dr. Singer of bilateral hand tremor when nervous, but no clear discrete shaking spells. She had severe migraine headaches three times a week. She complained of numbness in her fingers and toes, and weakness in both hands and in her left leg. On exam, Dr. Singer detected decreased sensation in the left upper extremity and left lower extremity, along with dysmetria on the left.[3] Cranial nerve V1–V3 exam was intact to light touch, but decreased to pinprick on

---

[3] "Dysmetria is a condition in which there is improper measuring of distance in muscular acts; hypermetria is overreaching (overstepping) and hypometria is underreaching (understepping)." http://www.ncbi.nlm.nih.gov/pubmed/1802262, accessed on June 17, 2014.

8

the left. He noted mild ataxia with regard to her gait.[4] (Tr. 250-251). Blood work showed that her Dilantin was at a less than therapeutic level, so the dosage was increased. (Tr. 249).

Ms. Singh's primary health care provider was Dr. Ramos-Pardo. Before the alleged date of onset, Dr. Ramos-Pardo treated her for various conditions including high blood pressure and depressive disorder. (226-233). On November 2, 2009, Dr. Ramos-Pardo noted that Dr. Singer had adjusted her medication because the nerves in her hands "were firing." He had prescribed an additional dose of Neurontin at mid-day, and she felt groggy during the day. She denied headaches or dizziness. (Tr. 223-224).

Plaintiff had only one visit with Dr. Ramos-Pardo after the alleged onset date. On May 3, 2010, which is the last documented visit with Dr. Ramos-Pardo, she reported that she had been told that she had another stroke. She had a bad headache and felt "a little staggery." She was being treated with a "migraine regimen" consisting of Clonazepam, Topamax. Dilantin, Citalopram and Norvasc. She had no current complaint of headache, but headache was included among the diagnoses. (Tr. 221-222).

Dr. Adrian Feinerman performed a consultative physical examination at the request of the agency in August, 2010. (Tr. 291-299). He did not review any of plaintiff's medical records. The examination, which took 30 minutes, was basically normal. Dr. Feinerman noted her history of stroke. He detected no

---

[4] Ataxia is "a lack of muscle control during voluntary movements, such as walking or picking up objects." http://www.mayoclinic.org/diseases-conditions/ataxia/basics/definition/con-20030428, accessed on June 17, 2014.

sensory loss to vibration, light touch or pinwheel. Muscle strength was normal and grip strength was strong and equal. Ambulation was normal and she had no difficulty with tandem walking, walking on toes or walking on heels. Fine and gross manipulation were normal. She was able to do activities with both hands such as picking up a coin, picking up a pen, and buttoning and unbuttoning. (Tr. 291-299).

Ms. Singh was hospitalized in September, 2010, for intractable headaches with vomiting. She had hit her head a few days before admission. (Tr. 313-314). She was treated with medication. The primary diagnosis was migraine headache. A CT scan of the head showed only the old right parietal infarct, with no acute abnormality. She had some left-sided weakness which was described as "baseline" and "secondary to the old stroke she had." (Tr. 315-316). After her discharge, she contacted Dr. Ramos-Pardo's office, and was told to follow up with Dr. Singer. (Tr. 345).

Ms. Singh called Dr. Singer's office after her discharge from the hospital, and he indicated he would see her to reevaluate her medications. (Tr. 425). He saw her on October 11, 2010, and ordered a check of her Dilantin level. She was to continue taking Topamax, and to restart Celexa and add Nortriptyline. Dr. Singer again found decreased sensation in the left upper and lower extremities, as well as a mildly ataxic gait. Cranial nerve V1–V3 exam was decreased to light touch and pinprick on the left. (Tr. 418-419). The next day, blood work showed her Dilantin level to be high, so he adjusted the dosage. (Tr. 424). In May, 2011, she complained of increased tremors in her hands, bilateral hand and foot numbness,

and decreased grip strength. She had not had any seizures, but continued to have severe headaches. On exam, Dr. Singer found decreased sensation in the left upper and lower extremities, mildly ataxic gait and mild difficulty with tandem walking. Cranial nerve V1–V3 exam was decreased to light touch on the left. (Tr. 515-516). The last documented visit was in November, 2011. Plaintiff complained of left hand and foot tingling and numbness. Dr. Singer again found decreased sensation in the left upper and lower extremities, mildly ataxic gait and mild difficulty with tandem walking. Cranial nerve V1–V3 exam was decreased to light touch on the left. (Tr. 513-514).

### 4.   Dr. Singer's Opinions

The record contains two forms filled out by Dr. Singer. The first, entitled "Seizures Residual Functional Capacity Questionnaire," was completed on April 6, 2008. Dr. Singer signed a statement on October 21, 2009, reaffirming the limitations set forth in the questionnaire, except that plainitff had not had any recent partial seizures. (Tr. 505-508). Both of these forms predate the alleged onset date, and are of limited relevance.

In June, 2011, Dr. Singer completed a form in which he assessed plaintiff's physical condition. He wrote that Ms. Singh had hand numbness and decreased grip strength. He also noted left face, arm and leg sensory loss and gait imbalance. In answer to the last question, he wrote that she had "some functional impairment since Aug[ust] 2006 – but worsening status x 3 mos [months]."  (Tr. 509-510).

### 5.   RFC Assessment

In September, 2010, a state agency consultant evaluated plaintiff's physical

11

RFC based upon a review of the records. She opined that plaintiff was able to do light work with no manipulative limitations.  It is not clear what, if anything, the consultant reviewed other than Dr. Feinerman's report.  There is no reference to Dr. Singer's records.  (Tr. 300-307).

A second state agency consultant assessed her RFC in November, 2010. This doctor did review Dr. Singer's records.  He noted that Dr. Singer found decreased sensation to light touch in the left lower extremity in October, 2010.  He also said that the medical records do not "detail any problems associated with the upper extremities or grip strength."  (Tr. 431-438).

## Analysis

Plaintiff's third point, regarding the weight given to Dr. Singer's opinion, is dispositive.

In the form completed in June, 2011, Dr. Singer opined that Ms. Singh has hand numbness, decreased grip strength, sensory loss in the left face, arm and leg, and gait imbalance.  The ALJ found that these opinions had "limited credibility" because "they are inconsistent with the rest of the medical evidence."

The ALJ noted that Dr. Singer "mentioned prominently" that plaintiff had problems with using her hands.   He rejected this opinion for the following reasons:

1. There was "no evidence of any nerve conduction studies validating such a complaint."

2. She had been able to work part-time at a restaurant since March, 2009.

3. She "feeds, dresses and bathes herself, does some household chores,

and still drives."

See, Tr. 24-25.

The ALJ is required to consider a number of factors in weighing a treating doctor's opinion. The applicable regulation refers to a treating healthcare provider as a "treating source." The version of 20 C.F.R. §404.1527(d)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added][5]

Obviously, the opinions of treating doctors are not necessarily entitled to controlling weight. Rather, a treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).**

If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. See, 20 C.F.R.

---

[5] The Court cites to the version of 20 C.F.R. §§ 404.1527 that was in effect at the time of the ALJ's decision. The agency subsequently amended the regulation by removing paragraph (c) and redesignating paragraphs (d) through (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656–57 (2012).

§404.1527(d).  In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." ***Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion**.  *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).**   While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."  ***Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000)**.

The ALJ wholly failed to mention that, on every visit, Dr. Singer reported that he detected decreased sensation in the left upper and lower extremities, mildly ataxic gait and mild difficulty with tandem walking.  He also never mentioned that Dr. Singer found that cranial nerve V1–V3 function was decreased to light touch and sometimes to pinprick on the left.

The ALJ erred in ignoring findings that supported Dr. Singer's opinion.  He compounded that error by discounting Dr. Singer's opinion because a nerve conduction study had not been done.  There is no question that Ms. Singh had a stroke in 2006.  The CT scan that was done while she was hospitalized in 2010 showed the old right parietal infarct.  There is no medical evidence in this case to establish that a nerve conduction study was necessary or appropriate to diagnose or evaluate her complaints of hand numbness, and the ALJ is not qualified to draw

14

that medical conclusion. It is error for an ALJ to "play doctor" and "reach his own medical conclusion." ***Miles*, 582 F.3d at 677**, citing ***Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003)**, and ***Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990).**

The Commissioner argues that the ALJ's rejection of Dr. Singer's opinion is supported by Dr. Feinerman's report and by the opinion of the state agency consultants. The flaw in this position is that the ALJ ignored the findings that supported Dr. Singer's opinion and never explained why he credited the results of a one-time examination by Dr. Feinerman over the results of repeated examinations by Dr. Singer, a neurologist. Further, the state agency consultant who assessed RFC in in November, 2010, also misstated the record by incorrectly stating that the medical records do not "detail any problems associated with the upper extremities or grip strength." (Tr. 431-438). Again, Dr. Singer repeatedly documented decreased sensation in the left upper extremity, which was ignored by both the ALJ and the reviewing state agency consultant.

The Commissioner also argues that that the ALJ's rejection of Dr. Singer's opinion is supported by the notes of her other treating doctor, Dr. Ramos-Pardo. This argument is unconvincing for several reasons. First, Dr. Singer is a neurologist who treated plaintiff for residuals of her stroke, while Dr. Ramos-Pardo is an internal medicine doctor who provided primary care to Ms. Singh. The ALJ stated that Dr. Ramos-Pardo treated Ms. Singh "mainly for monitoring of her hypertension," along with a depressive disorder and allergic rhinitis. Secondly, ALJ Warzycki pointed out that Dr. Ramos-Pardo's records do not contain

15

complaints of "headaches, dizziness, chest pain or shortness of breath." (Tr. 22). Notably, the ALJ did not cite to any information in Dr. Ramos-Pardo's notes regarding Ms. Singh's ability to use her hands, or to the absence thereof. In advancing reasons not relied upon by the ALJ, the Commissioner violates the *Chenery* doctrine. See, **SEC v. Chenery Corporation, 318 U.S. 80 (1943).** "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." **Kastner v. Astrue, 697 F.3d 642, 648 (7th Cir. 2012).**

The Court also agrees with plaintiff's point that the ALJ overstated her testimony about her daily activities. He highlighted her ability to feed and dress herself and to do some household chores. However, he ignored her testimony that she had difficulty with buttons and zippers, she broke glasses and plates while washing dishes, and her cooking consisted of reheating food in the microwave. (Tr. 48-50) Further, her work at the restaurant consisted only of filing papers, occasionally putting napkins and tablecloths on tables, and printing reservation signs. (Tr. 53-54). She only "worked" when she felt up to it. (Tr. 41). This is not to say that the ALJ was required to accept her testimony as true. However, it is one thing to say that plaintiff's testimony is not credible; it is quite another to overstate her testimony about her abilities.

In the end, the Court is left in the dark about exactly why the ALJ rejected Dr. Singer's opinion. "An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection." **Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011).** ALJ Warzycki's failure to provide a sound explanation

16

requires remand.  Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2010), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Singh is disabled or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Christine Singh's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:**    June 19, 2014.


                                          s/ Clifford J. Proud
                                          **CLIFFORD J. PROUD**
                                          **UNITED STATES MAGISTRATE JUDGE**